******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MARCELLO EDWARDS *v.* COMMISSIONER OF CORRECTION
## (AC 39632)

Sheldon, Bright and Bear, Js.

*Syllabus*

The petitioner, who had been convicted of assault in the first degree and of violation of probation in connection with the stabbing of the victim, sought a writ of habeas corpus, claiming that his trial counsel had rendered ineffective assistance. The petitioner claimed, inter alia, that because his counsel failed to subject the state's case to any meaningful adversarial testing, the habeas court should have presumed, pursuant to *United States* v. *Cronic* (466 U.S. 648), that the petitioner was prejudiced and, thus, granted his habeas petition. The petitioner's trial counsel had declined to cross-examine the victim, who had initially told the police that she did not know who had assaulted her, and declined to cross-examine the victim's children, who were present at the time of the assault. Counsel also failed to meaningfully cross-examine any of the state's witnesses and did not investigate the petitioner's alibi claim or introduce any alibi evidence, despite having reviewed certain witness statements that supported the alibi, and counsel did not interview any of the petitioner's witnesses, all of whom were available at the time of trial. The habeas court determined that counsel's decision not to cross-examine the state's witnesses was a strategic decision, as to which he could not have been found to have rendered deficient performance, and that the petitioner failed to point out how cross-examination would have benefited the defense. The court further concluded that the petitioner failed to prove that the outcome of the criminal trial would have been different if his counsel had investigated the alibi and interviewed the alibi witnesses. The habeas court rendered judgment denying the habeas petition, from which the petitioner, on the granting of certification, appealed to this court. *Held* that the habeas court improperly denied the petition for a writ of habeas corpus; that court should have presumed, pursuant to *Cronic*, that the petitioner was prejudiced as a result of his trial counsel's failure to subject the state's case to any meaningful adversarial testing, as it was clear that counsel had determined that the petitioner was the perpetrator and would be convicted, and counsel's utter lack of advocacy on the petitioner's behalf in declining to cross-examine the victim and her children, and in failing to investigate his alibi, could not reasonably be construed as strategic, which was apparent from counsel's opinion that the evidence against the petitioner was overwhelming and that the petitioner's case was one in which there was no defense.

Argued April 19—officially released July 31, 2018

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Oliver, J.*; thereafter, the petition was withdrawn in part; judgment denying the petition; subsequently, the court granted the petition for certification to appeal, and the petitioner appealed to this court. *Reversed; judgment directed; further proceedings.*

*Pamela S. Nagy*, assistant public defender, for the appellant (petitioner).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Angela R. Macchiarulo*, senior

assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Marcello Edwards, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus claiming ineffective assistance of counsel during his criminal trial, which resulted in his conviction of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and the revocation of his probation as a result of his violation of General Statutes § 53a-32. On appeal, the petitioner claims that because his trial counsel, Raul Davila, failed to subject the state's case against him to any meaningful adversarial testing, his claim is controlled by *United States* v. *Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), and prejudice should be presumed.[1] On that basis, he claims that the habeas court should have granted his petition for a writ of habeas corpus, set aside his conviction and the revocation of his probation, and remanded his case for a new trial. We agree, and therefore reverse the judgment of the habeas court.[2]

On December 11, 2012, the petitioner was convicted of assault in the first degree in violation of § 53a-59 (a) (1). On December 12, 2012, he was found in violation of his probation. In affirming the petitioner's conviction and the revocation of his probation, this court set forth the following relevant factual and procedural history. "The victim[3] . . . met the [petitioner] when she was fifteen and he was twenty or twenty-one years old. They began dating at that time and eventually had two children together, [J] and [S]. The [petitioner] physically abused the victim during their relationship. On one occasion, the [petitioner] attacked the victim while she was at work, forcing her to lock herself in the office of a coworker to escape physical harm. On another occasion, when the [petitioner] and the victim argued, he punched her in the head, splitting her lip and rupturing her eardrum. In August, 2009, the relationship ended, and the [petitioner] moved out of the victim's home.

"On November 16, 2011, the [petitioner] took [S] to McDonald's after school and later brought her back to his mother's house, where he then lived. Shortly thereafter, the victim arrived to pick up [S] and take her home. Upon returning home, the victim called [J], who was home alone, and asked him to unlock the door to let them in the house. As the victim approached the house, however, the [petitioner] accosted her and stabbed her repeatedly in the head, chest, arm, and thigh. When the victim cried out for help, the [petitioner] fled. [J] ran to the entry of the house, where he saw the victim, lying on the ground, bleeding. He dragged his mother into the house and called 911. After the victim was taken to a hospital, [J] texted the [petitioner], 'You're not gonna get away with it. You're going to jail.' The [petitioner] responded by text, 'Fuck you.'

"Thereafter, the [petitioner] was arrested and charged with assault in the first degree and violation of probation. The [petitioner] pleaded not guilty to both charges and elected a jury trial on the assault charge." (Footnote added.) *State* v. *Edwards*, 158 Conn. App. 119, 121–22, 118 A.3d 615, cert. denied, 318 Conn. 906, 122 A.3d 634 (2015).

"On the charge of assault in the first degree, the court sentenced the [petitioner] to a term of twenty years of incarceration, of which five years was a mandatory minimum sentence that could not be suspended or reduced. On the charge of violation of probation, the court sentenced the [petitioner] to a term of thirty-seven months incarceration, to be served consecutively to his sentence for first degree assault." Id., 130–31.

On August 9, 2013, the petitioner filed his petition for a writ of habeas corpus in this matter. At his trial before the habeas court, the petitioner made three specific claims as to ways in which Davila was ineffective, namely, that Davila failed to request an additional competency evaluation; that Davila failed to cross-examine the state's witnesses; and that Davila failed to investigate his claimed alibi.

By way of memorandum of decision filed July 13, 2016, the habeas court rejected the petitioner's claims of ineffective assistance, and thus denied the petitioner's petition for a writ of habeas corpus. The habeas court determined that the petitioner failed to prove that an additional competency evaluation "would have yielded a result favorable to the petitioner," and thus that the petitioner failed to prove that he was prejudiced by Davila's alleged failure to seek an additional competency evaluation. The court determined that Davila's decision not to cross-examine the state's witnesses was a strategic decision as to which he could not have been found to be deficient. The court further found that the petitioner failed "to point out a line of inquiry on cross-examination of these witnesses that would have been beneficial to the defense . . . ." Finally, the court found the petitioner's claimed alibi "unavailing," and that the petitioner failed to prove that if Davila had further investigated the petitioner's alibi and interviewed his alibi witnesses himself, the outcome of the criminal trial would have been different. The court thereafter granted the petitioner's petition for certification to appeal, and this appeal followed.

On appeal, the petitioner claims that Davila's representation of him was so ineffective that he failed to subject the state's case against him to any meaningful adversarial testing, and thus that prejudice should be presumed under *Cronic*.[4] On that basis, the petitioner argues that his petition for a writ of habeas corpus should have been granted. We agree.

"The issue of whether the representation that a [peti-

tioner] received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, the question requires plenary review unfettered by the clearly erroneous standard. . . .

"The sixth amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the effective assistance of counsel. . . . This right is incorporated to the states through the due process clause of the fourteenth amendment. . . . *Strickland* [v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] and *Cronic* set forth the framework for analyzing ineffective assistance of counsel claims. Under the two-pronged *Strickland* test, a [petitioner] can only prevail on an ineffective assistance of counsel claim if he proves that (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice. . . . To demonstrate deficient performance, a [petitioner] must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys. . . . To demonstrate actual prejudice, a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. . . .

"*Strickland* recognized, however, that [i]n certain [s]ixth [a]mendment contexts, prejudice is presumed. . . . In . . . *Cronic* . . . which was decided on the same day as *Strickland*, the United States Supreme Court elaborated on the following three scenarios in which prejudice may be presumed: (1) when counsel is denied to a [petitioner] at a critical stage of the proceeding; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when counsel is called upon to render assistance in a situation in which no competent attorney could do so." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 554–55, 126 A.3d 538 (2015). "This is an irrebuttable presumption. See *State* v. *Frye*, 224 Conn. 253, 262, 617 A.2d 1382 (1992) (right to counsel is so basic that its violation mandates reversal even if no particular prejudice is shown and even if there is overwhelming evidence of guilt) . . . ." (Internal quotation marks omitted.) *Newland* v. *Commissioner of Correction*, 322 Conn. 664, 699–700, 142 A.3d 1095 (2016).

To assess the petitioner's claim that Davila failed to subject the state's case against him to meaningful adversarial testing, and thus that Davila's representation of him requires reversal under *Cronic*, we begin by reviewing the record of the petitioner's criminal trial. Prior to the petitioner's trial, the court held two hearings to determine the petitioner's competence to stand trial. At the first hearing, the court found that the petitioner was not competent, but that his competency could be restored. The court thus ordered that the petitioner be committed for treatment at the Whiting Forensic

Division of Connecticut Valley Hospital for a period of sixty days. At the conclusion of that commitment, a second competency hearing was held, at which the court, on the unanimous recommendation of the forensic team that had treated the petitioner, found that he had been restored to competency, and thus that he could stand trial. Davila attended both hearings but did not cross-examine any witnesses at either hearing.

During voir dire, the petitioner was removed from the courtroom due to his disruptive behavior.[5] The petitioner continued that behavior and was therefore absent from the courtroom for the majority of his trial. On the first day of trial, the state called the victim to the witness stand. The victim testified regarding her abusive past with the petitioner, the assault that she suffered on November 16, 2011, and her identification of the petitioner as the individual who had assaulted her. Davila did not cross-examine her.

The state then called S to the witness stand. S testified that she saw her father leave her grandmother's house about five or ten minutes before her mother picked her up on the day of the assault. Davila did not cross-examine her.

The state then called J to the witness stand. J described the events of November 11, 2016, from his perspective. He had been home when his mother called to ask him to unlock the door so that she and his sister could come in after returning from a supermarket. After S entered, he went to the kitchen with her, and then he heard his mother crying out for help. He ran back to the back door, where he "saw [his mother] on the floor and . . . a person with a black coat running away." He testified that he could "[n]ot really" see the perpetrator's face and thus did not recognize him at first. He observed the individual running away, and the back of the perpetrator's body "remind[ed]" him of his father, the petitioner. He picked up his mother off the ground and dragged her into the house, and called the police. After his mother was taken to a hospital, he sent a text message to the petitioner, telling him that he was not going to get away with assaulting his mother, to which the petitioner replied, " '[f]uck you.' " J later showed those text messages to the police. Davila did not cross-examine him.

The state then called Detective Luis Poma to the witness stand. He testified as to the investigation of the assault of the victim, ultimately leading to his arrest of the petitioner. He testified that, upon arriving at the crime scene, he spoke with the officers who were already there, and learned that the petitioner was a potential suspect. He stated that the victim's house was approximately one mile away from the petitioner's mother's house, and that it took him approximately five minutes to drive that mile. Poma was unable to speak to the petitioner when he arrived at the petitioner's

mother's house. He then proceeded to Saint Francis Hospital and Medical Center in Hartford to check on the condition of and to speak to the victim. Due to her medical condition, he was unable to speak to the victim on that day. He did, however, speak to J regarding the text messages between J and the petitioner. Poma telephoned the petitioner and had a brief conversation with him during which the petitioner referred to the victim as "a bitch." Poma was able to speak to the victim on November 21, 2011, at which time he showed her a photographic array, from which she identified the petitioner as her assailant. Davila cross-examined Poma only as to the difference between "on-site arrests" and arrests by warrant. Davila did not ask Poma any questions about his investigation of the assault of the victim or the arrest of the petitioner.

The state then called Dr. Scheuster Christie to the witness stand. Christie testified regarding his treatment of the victim on the night of the assault. Davila did not cross-examine him.

The state then called Officer Valentine Olabisi to the witness stand. Olabisi testified that he had responded to the scene of the assault and then proceeded to the home of the petitioner's mother and spoke to the petitioner. Olabisi asked the petitioner where he had been between the hours of 3 p.m. and 6 p.m. on the day of the assault. The petitioner told him that "he had been home all day with his mother, and just started to become very angry and uncooperative at that time." Olabisi also testified that it had taken him less than five minutes to drive from the victim's house to the petitioner's mother's house. Davila did not cross-examine him.

After the state rested, Davila addressed the court: "I make a motion, Your Honor, that the state hasn't proved its case beyond a reasonable doubt as it presented— presents its evidence for the case to go to the jury, so I'd ask the court for a directed verdict." The court denied Davila's motion with no further argument or elaboration from Davila.

Davila presented no witnesses or evidence on behalf of the petitioner.

By way of closing argument, Davila argued to the jury that the state had presented no evidence of what "triggered" the assault of the victim, and asked the jury to "focus on . . . the fact that [S], [J] and [the victim] . . . all disliked [the petitioner]. And that was clear from the testimony." He told the jury that all three of them "had a motive and had a bias to testify against [the petitioner]."

At the habeas trial, Davila testified that, in preparation for the petitioner's criminal trial, he read the file provided to him by the petitioner's prior attorney, Aaron J. Romano, which included reports from an investigator hired by Romano. Davila stated that after reading

Romano's file, he developed a theory of the case, namely, that the petitioner was not the individual who had assaulted the victim. When asked how he supported that theory to the jury, Davila explained that the petitioner had been removed from the courtroom, and, consequently, Davila had "nobody next to [him] to sort of help me trying to defend [the petitioner]." Davila testified at the habeas trial that it was difficult to defend the petitioner because he had stabbed the victim "upward of thirty-four times in front of her two children . . . ." Davila stated that the evidence against the petitioner was overwhelming, and that "[t]here are cases where you have no defense" and that he "argued as best as [he] could during [his] closing [argument] that [the petitioner] did not commit this crime." He agreed with counsel for the respondent, the Commissioner of Correction, that "given the uncooperative nature [of the petitioner] at that point and the overwhelming evidence against him, [that his] best bet was to argue for mitigation at sentencing."[6]

As to the petitioner's specific claim that Davila should have cross-examined the state's witnesses, he explained that he did not cross-examine the victim or her children because he had the statements that they had given to the police and it is a "cardinal [rule] of cross-examination [that] you don't ask a question unless you know what the answer's going to be . . . ." Davila then testified that he did not want to garner more sympathy for the victim by cross-examining her or the children and that he could not do so anyway because the petitioner was not at the counsel table with him. Davila acknowledged that the police report indicated that the victim initially had told the police that she did not see who stabbed her, and that even though this could have been used for cross-examination, he did not do so. He stated that part of his strategy in not cross-examining the victim or her children was to avoid repeated identifications by them of the petitioner as the individual who had stabbed the victim. Davila testified that "if there was any basis for cross-examination that would actually elicit any testimony that in my opinion would have furthered [the petitioner's] defense and best interest . . . I certainly would have cross-examined the witnesses."

As to the petitioner's claim that Davila failed to investigate his alibi, Davila acknowledged that he did not interview any witnesses or hire an investigator. Davila testified that he would have interviewed the petitioner's alibi witnesses if he "thought that there was any merit to them." Davila read the alibi statements, but decided that they were not credible because they conflicted with certain testimony by S and J. As for potential alibi witnesses, Davila testified that he "relied on the statements provided to [him] by the state where [the petitioner's] common law wife or wife and his kids all identified [the petitioner] as the person who committed

this crime." Davila spoke with the petitioner's sister "at least two times" regarding her concern for the petitioner, but he never discussed with her a possible alibi for him.

At the habeas trial, the petitioner's mother, Olga Kellier, and sister, Delmarie Robinson, testified on his behalf. Their testimony at the habeas trial was consistent with the statements they had given to the investigator hired by Romano, all of which were included in the file that Romano had given to Davila. Kellier testified that the petitioner was at home all day on the day of the assault, except when he picked S up from school. She testified that she had received a telephone call from the victim's neighbor, Sylvia Neufville, at about 6 p.m. on the evening of November 16, 2011. Neufville told Kellier that the victim had been stabbed and that the petitioner was the suspected perpetrator. Kellier called up the stairs to the petitioner's bedroom, but the petitioner did not reply. Kellier then proceeded up the stairs where she found the petitioner sleeping in his bedroom. Robinson, who had arrived home from work just before Neufville called, corroborated Kellier's testimony.[7] S testified that she saw her father leave Kellier's house about ten minutes before the victim picked her up. That testimony went uncontested when Davila declined to cross-examine her and failed to introduce testimony from Kellier or Robinson.

Although Davila claimed to have formed a "theory of the case"—that the petitioner did not attack the victim—he did nothing at the petitioner's criminal trial to advance that theory. The petitioner consistently has claimed that he did not assault the victim. Despite the petitioner's adamance, Davila declined to cross-examine any of the three people who were present at the time of the assault. As noted previously, Davila failed to meaningfully cross-examine any of the state's witnesses except for a police officer, whom he asked irrelevant questions. See *United States* v. *Cronic*, supra, 466 U.S. 659 (denial of right of effective cross-examination would be constitutional error of first magnitude and no amount of showing of want of prejudice would cure it). Davila declined to cross-examine the victim even though she told police initially that she did not know who had assaulted her. Even though the petitioner steadfastly maintained that he never left his mother's house, Davila declined to cross-examine S, who stated that she had seen him leave just before her mother picked her up. Of course, cross-examination of S would have been more effective if Davila had introduced evidence of the petitioner's alibi. Davila, however, did not introduce any such evidence. The file given to and reviewed by Davila contained witness statements supporting the petitioner's claim that he was at his mother's house when the assault occurred. Nevertheless, Davila did not investigate the petitioner's claim of alibi or interview any of his witnesses, all of whom were avail-

able at the time of trial. It is clear from Davila's testimony at the habeas trial that he had already determined that the petitioner was the perpetrator and that he would be convicted of the assault of the victim. Davila's utter lack of advocacy on the petitioner's behalf—in declining to cross-examine the victim and her children and failing to investigate his alibi—cannot reasonably be construed as strategic. This is apparent from Davila's stated opinion that the evidence against the petitioner was overwhelming and his implication that the petitioner's case was one in which there was no defense. Davila failed to subject the state's case against the petitioner to any meaningful adversarial testing, and, pursuant to *Cronic*, prejudice to the petitioner must therefore be presumed.

The judgment is reversed and the case is remanded with direction to grant the petitioner's petition for a writ of habeas corpus, to vacate the petitioner's conviction of assault in the first degree and the revocation of his probation, and to order a new trial.

In this opinion the other judges concurred.

[1] The petitioner also argues that the habeas court erred in concluding that he was not denied the effective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Because we agree with the petitioner's *Cronic* claim, we need not address his claim for relief under *Strickland*.

[2] The revocation of the petitioner's probation was based on his conviction of the assault of the victim in this case, which we are ordering to be vacated. Consequently, the revocation of his probation also must be vacated and the case remanded for a new trial.

[3] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] Although the petitioner did not specifically invoke *Cronic* in his habeas petition, and the habeas court did not explicitly rule on his *Cronic* claim, he did argue, in both his trial brief and oral argument to the habeas court, that Davila's performance was so deficient that prejudice should be presumed under *Cronic*. The respondent, the Commissioner of Correction, has not claimed on appeal that the petitioner's *Cronic* claim is unpreserved. Although our Supreme Court has declined to address ineffective assistance claims "unless they arise out of the actions or omissions of the habeas court itself . . . the petitioner in the present case did not raise any *new claim* on appeal, he merely refined his argument as to the same alleged deficiency. . . . *Strickland* [v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] introduces the concept of presumption of prejudice, which *Cronic* later refines. . . . Thus, the petitioner did not introduce an entirely new theory on appeal, obviating our concerns about fairness to the trial court and opposing party." (Citations omitted; emphasis in original.) *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 553 n.4, 126 A.3d 538 (2015).

Here, although the petitioner argued to the habeas court that Davila's representation of him was so deficient that prejudice should be presumed under *Cronic*, the habeas court addressed prejudice only under *Strickland*. Because, as noted in *Davis*, *Strickland* introduces the concept of presumption of prejudice, later refined by *Cronic*, we follow the *Davis* court's lead—particularly in light of the fact that the state has fully briefed and argued the petitioner's *Cronic* claim—and review the petitioner's claim that Davila's representation of him was so deficient that prejudice should be presumed.

[5] The petitioner had also been removed from the courtroom for similar disruptive behavior during his second competency hearing.

[6] Although the petitioner did not allege that Davila ineffectively represented him at the sentencing hearing, we note that Davila argued only that the way the petitioner "was portrayed during the course of the trial is completely different from how his family and his pastor perceive him to be. . . . So, in any event, I know that the court is going to be fair with him.

The court was fair throughout the trial, and I just leave it to Your Honor to impose a fair and equitable sentence in this case."

[7] In her statement to the investigator hired by Romano, which was contained in the file that was forwarded to and reviewed by Davila, Neufville corroborated Kellier's statement that the petitioner had been upstairs sleeping when she called Kellier. Neufville also told the investigator that the petitioner could not have assaulted the victim and returned home quickly enough to be found upstairs sleeping by Kellier.

---