******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ADAM M. ZACHS *v.* COMMISSIONER
OF CORRECTION
(AC 43380)

Moll, Alexander and Bishop, Js.

*Syllabus*

The petitioner, who had been convicted of the crime of murder, sought a
writ of habeas corpus, claiming, inter alia, that his criminal trial counsel,
D and W, had rendered ineffective assistance. The petitioner, who had
shot the victim during an altercation at a café, testified at trial that
the gun he was carrying at the time of the shooting had accidentally
discharged. When the state sought to present rebuttal testimony from
six witnesses as to prior uncharged conduct by the petitioner related
to his use of guns, the trial court, at the request of D, who sought to
avoid a conflict of interest, admitted W pro hac vice for the purpose of
cross-examining the state's rebuttal witnesses, two of whom were then
represented by D in other matters. Neither D nor W thereafter cross-
examined the rebuttal witnesses. The court, at D's request, instructed
the jury as to certain lesser included offenses within the crime of murder
and on the affirmative defenses of not guilty by reason of mental disease
or defect and extreme emotional disturbance. The petitioner alleged
that D was ineffective because, inter alia, the affirmative defenses and
lesser included offenses were inconsistent with the petitioner's trial
testimony, that the only reasonable trial strategy would have been for
D to pursue a claim that the gun accidentally discharged and that the
petitioner's conduct fit the parameters of the lesser included offense of
manslaughter in the second degree. The petitioner also grounded his
ineffective assistance of counsel claim in D's conflict of interest in
concurrently representing two of the state's rebuttal witnesses and D's
decision to have W handle the cross-examination of those witnesses,
which the petitioner asserted was insufficient to ameliorate the possibil-
ity that he would be prejudiced by D's conflict of interest. The petitioner
further asserted that D was ineffective in having conceded the issue of
whether the petitioner had intended to kill the victim by asserting the
affirmative defenses and by presenting a theory of the case at trial that
was inconsistent with the petitioner's testimony that the gun accidentally
discharged. The petitioner also asserted that W was ineffective for having
failed to cross-examine the rebuttal witnesses. The habeas court denied
the habeas petition, concluding, inter alia, that neither D nor W had
rendered ineffective assistance, and that the petitioner mischaracterized
the defense case D had presented in that D had argued repeatedly
before the jury that the gun discharged accidentally. The court further
determined that the petitioner had procedurally defaulted on and waived
his claim that D's concurrent representation of the two rebuttal wit-
nesses constituted an actual conflict of interest. The habeas court there-
after granted the petitioner certification to appeal, and the petitioner
appealed to this court. *Held*:

1. The habeas court correctly denied the petitioner's claim that D rendered
ineffective assistance, as the petitioner failed to establish that there was
no tactical justification for D's defense strategy, which was consistent
with the petitioner's testimony that the gun accidentally discharged: the
evidence supported the court's finding that D's primary strategy was to
argue that the gun was fired accidentally, as the first issue D discussed
during closing argument to the jury was whether the petitioner intended
to kill the victim, D later reminded the jury that it had to make a
determination as to that issue, and he spent a significant amount of
time arguing that the shooting was accidental; moreover, the petitioner's
claim that it was unreasonable for D to present a defense that was
inconsistent with the petitioner's testimony was misplaced, as D's strat-
egy to show that the petitioner lacked the intent to kill the victim
comported with the petitioner's explanation of how the gun discharged,
it was not deficient performance to pursue defenses that were inconsis-
tent with each other, and it was inconsistent with the principle that a
defendant is innocent until proven guilty for the petitioner to suggest

that D, by presenting the affirmative defenses, conceded that he intended to kill the victim, the trial court having made it abundantly clear to the jury that it had to first decide whether the petitioner was guilty of murder before it could reach the affirmative defenses; furthermore, D's decision to present the affirmative defenses and the supporting testimony of a psychologist was not unreasonable because of the mere possibility that it could have led to the admission of the state's rebuttal evidence, as the psychologist had been called to testify before D requested jury instructions as to the affirmative defenses, the court, prior to the psychologist's testimony, had ruled against the admission of evidence of prior incidents in which the petitioner displayed guns, and the court instructed the jury that the rebuttal evidence could not be used as evidence of intent.

2. The petitioner could not prevail on his claim that the habeas court erred in concluding that he procedurally defaulted on and waived his conflict of interest claim as to D:

a. The habeas court appropriately concluded that the conflict of interest claim was procedurally defaulted, as the petitioner could not establish good cause for not raising that issue on direct appeal; contrary to the petitioner's assertion that his claim could not be procedurally defaulted because the record was inadequate to raise it on direct appeal, the factual and legal basis of the claim was available to counsel at the time of appeal, as the record established that D explained the conflict to the trial court, which then explained to the petitioner that D would have a conflict if he cross-examined the rebuttal witnesses, the trial court acquired the petitioner's assent to proceed with W handling the cross-examination of the state's rebuttal witnesses, and the record revealed the immediate consequences of D's apparent conflict of interest, as W handled the cross-examination but asked no questions.

b. The petitioner's claim that the habeas court improperly found that he waived his conflict of interest claim as to D was unavailing: the record indicated that D and the petitioner discussed the conflict during a recess at trial, and that the petitioner subsequently stated to the trial court his approval of having W cross-examine the rebuttal witnesses after the trial court advised him that D could not adequately and fairly cross-examine them as a result of the conflict; moreover, contrary to the petitioner's assertion that his waiver of D's conflict of interest was premised on cross-examination of the state's rebuttal witnesses actually occurring, the defense plan was not to ask any questions of the rebuttal witnesses, and, with the exception of two of the rebuttal witnesses who had heard from the petitioner about one of the prior incidents at issue, none of the state's six rebuttal witnesses was cross-examined; furthermore, the petitioner's waiver of his conflict of interest claim did not foreclose him from claiming that W's handling of those cross-examinations constituted ineffective assistance.

c. The habeas court correctly determined that the petitioner had procedurally defaulted on his claim pursuant to *United States* v. *Cronic* (466 U.S. 648) that prejudice against him should have been presumed because of D's conflict of interest, the *Cronic* claim having had a factual basis that was identical to the petitioner's unsuccessful conflict of interest claim.

3. The habeas court correctly denied the petitioner's claim that he was entitled to a presumption of prejudice under *Cronic*, which was based on his assertion that W rendered ineffective assistance by failing to cross-examine two of the state's rebuttal witnesses and to subject its case to meaningful adversarial testing: W's actions did not rise to a level that would constitute such a failure, and, even if it were presumed that it was error for W not to have cross-examined the two rebuttal witnesses, his failure was not complete, as the testimony of the rebuttal witnesses was admitted for the limited purpose of credibility, the issue concerned only two of dozens of witnesses who testified during trial, the substantially similar testimony of two other witnesses was unchallenged, and D subjected the state's case to meaningful adversarial testing through his objections, voir dire and cross-examinations of the state's witnesses, and presentation of four defense witnesses; moreover, although analysis of W's alleged failures was more appropriate pursuant to the performance and prejudice test for ineffective assistance of counsel under *Strickland* v. *Washington* (466 U.S. 668), no further analysis was necessary, the petitioner having explicitly stated that his claim should not be analyzed for prejudice under *Strickland*.

4. The habeas court did not improperly decline to consider the aggregate

effect of the trial court's alleged errors; because the petitioner failed to prove each of his individual underlying claims of error and our Supreme Court has declined to adopt such a cumulative error analysis, it was not within this court's authority to grant the petitioner the relief he sought.

Argued April 15—officially released June 15, 2021

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Jennifer B. Smith*, with whom was *Aaron J. Romano*, for the appellant (petitioner).

*Samantha L. Oden*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Jo Anne Sulik*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, Adam M. Zachs, appeals from the judgment of the habeas court, *Newson, J.*, denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly (1) denied his ineffective assistance of counsel claim regarding the defense strategy employed at his criminal trial by one of his defense attorneys, Attorney Edward J. Daly, Jr., (2) determined that his conflict of interest claim was both procedurally defaulted and waived, (3) denied his ineffective assistance of counsel claim regarding the failure of his other defense attorney, Attorney Brian W. Wice, to cross-examine the state's rebuttal witnesses at his criminal trial, and (4) declined to apply a cumulative prejudice approach and consider the aggregate effect of counsels' alleged errors. We affirm the judgment of the habeas court.

The jury in the petitioner's criminal trial reasonably could have found the following facts. On March 22, 1987, the petitioner went to the Prospect Café in West Hartford to watch a basketball game on television. Shortly thereafter, the victim, Peter Carone, and his fiancée, Kathleen O'Brien, arrived to watch the basketball game and sat next to the petitioner at the bar. The victim bought the petitioner a drink after he moved down a seat to make room for the victim and O'Brien. The petitioner, the victim, and O'Brien spent most of the afternoon seated at the bar together, having drinks and casually discussing the basketball game.

Later that evening, the victim told a joke to another patron at the bar about a "spit shine." As part of this joke, he spat on the bar and wiped it up with a napkin. The petitioner, a regular customer at the bar, was offended by the victim's actions. He sat at the bar for a few more minutes, then walked to the other end of the bar to tell the bartender and the waitress that he wanted to pay his bill and leave. The petitioner told the waitress that he was "disgusted" by the victim's actions, called him a "pig," and stated that "the only reason he's not going to deck the guy . . . was because there were ladies present." The petitioner then left the bar, and went to his car and sat in it for a few minutes before reentering the bar to speak to the waitress about what had happened. As the petitioner approached the waitress, the victim turned to him to apologize and to discuss why the petitioner had left the bar. The petitioner and the victim spoke about the incident for a few minutes and then stepped outside the bar to talk. The petitioner testified that they both insisted that they did not want to fight.

The petitioner and the victim stood outside the bar "[i]immediately in front of [the] main door." Several witnesses had a partial view of where they were standing and intermittently looked out the window to see if

a fight would break out. After about four minutes, the victim turned and approached the main door to the bar. Just as the victim reached the door, the petitioner shot him once in the back with a pistol that he had tucked into the waistband of his pants, killing the victim.[1]

The petitioner subsequently was charged with murder in violation of General Statutes § 53a-54a (a). At his criminal trial, he was represented by Attorney Daly and, for a limited portion of the trial, by Attorney Wice, who was licensed to practice law in Texas and was admitted by the trial court pro hac vice for the limited purpose of cross-examining the state's rebuttal witnesses. See part II of this opinion. Attorney Daly[2] requested jury instructions on the lesser included offenses of manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide. He also requested jury instructions on the affirmative defenses of not guilty by reason of mental disease or defect and extreme emotional disturbance. With no objections from the state, the court granted those requests. After a jury trial, the petitioner was found guilty of murder and sentenced to sixty years of incarceration on October 13, 1988. The petitioner was released after posting an appeal bond and thereafter absconded to Mexico where he lived under an assumed identity until being returned to the United States in 2011. Although the petitioner had filed a direct appeal from the judgment of conviction, his appeal was dismissed after his disappearance on the basis of a motion filed by the state.

On September 28, 2012, the self-represented petitioner filed a petition for a writ of habeas corpus. The petitioner filed the operative petition, his fourth amended petition for a writ of habeas corpus, with the assistance of counsel on September 17, 2018. The fourth amended petition contained eight counts, five of which are relevant to this appeal. Specifically, in count two, the petitioner alleged that Attorney Daly rendered ineffective assistance by presenting an objectively unreasonable defense. In count three, the petitioner alleged that Attorney Daly had a conflict of interest that materially prejudiced his defense, and, in count four, he alleged that this conflict of interest entitled him to a presumption of prejudice under *United States* v. *Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). In count five, the petitioner alleged that Attorney Wice, who handled only a small portion of the petitioner's criminal trial, was ineffective in failing to cross-examine two of the state's rebuttal witnesses. Count five included claims brought under *Cronic* and *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Last, in count eight, the petitioner alleged that the cumulative effect of his counsels' actions deprived him of a fair trial. The claims set forth in the remaining counts have not been advanced on appeal.

A trial on the habeas petition was held on November 26 and 27, 2018. On July 23, 2019, the habeas court, *Newson, J.*, issued a memorandum of decision in which it denied each of the petitioner's claims. Thereafter, the petitioner filed a petition for certification to appeal from the judgment denying his petition for a writ of habeas corpus. The habeas court granted the petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before we turn to the petitioner's claims, we briefly set forth our standard of review for habeas corpus appeals. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

I

We first address the petitioner's claim that the habeas court improperly concluded that Attorney Daly did not provide ineffective assistance with regard to the defense strategy he employed at the petitioner's criminal trial. Specifically, the petitioner argues that the affirmative defenses advanced by Attorney Daly were objectively unreasonable and that the only reasonable trial strategy was to pursue a conviction of manslaughter that was based on a defense that the petitioner's gun had accidentally discharged. Additionally, the petitioner argues that the court's characterization of Attorney Daly's trial strategy was clearly erroneous. We agree with the court's characterization of Attorney Daly's strategic choices at trial and with the court's subsequent conclusion that the petitioner failed to demonstrate that counsel's strategy was objectively unreasonable.[3]

The following additional facts are relevant to our resolution of this claim. To support the affirmative defenses posed by defense counsel, the petitioner testified at his criminal trial concerning an incident that occurred in February, 1986, when, while he was asleep, a large male kicked in his bedroom door. The petitioner explained that he went to bed early that night, then was suddenly awakened to find the large male standing over him and threatening to kill him. The individual threatened to kill the petitioner if he "ever tormented his sister again." The petitioner did not know to whom he was referring. After the incident, the petitioner testi-

fied that he became afraid to leave his house. A few days later, he saw an advertisement for a gun shop. The incident prompted the petitioner to purchase two firearms, a .22 caliber Beretta and, eventually, the nine millimeter Smith & Wesson that he used in the shooting. He explained that he had purchased these firearms because he was still scared from the encounter and carried one of them with him for "[e]very occasion."

The petitioner further explained that this incident greatly impacted how he handled the confrontation with the victim on March 22, 1987, and testified that he accidentally discharged the gun, which caused the victim's death. The petitioner testified that he tried to end their conversation outside the bar, but the victim "stepped very close" to the petitioner and continuously told him that he thought it was "stupid" that he had left the bar. The petitioner became nervous and began to step backward, but the victim matched each step, moving toward the petitioner until his back was pressed against either a wall or a fence. The petitioner explained that "[e]verything was very dim and foggy and . . . in speaking to him, I felt like my brain wasn't in control of my mouth, that I was listening to the words come out of my mouth, that it wasn't me speaking them." He testified that he was instantly reminded of the break-in incident. It felt like there was a "movie screen" in his head and that all he could see was the individual who had broken into his bedroom. The next thing that the petitioner recalled was the victim hitting the side of his head, at which point the sensation of seeing a "movie screen" abruptly stopped. He suddenly realized that he was holding a gun and that the victim was standing in front of him, not the individual from the break-in. He did not remember drawing the gun. Then, the victim swung his hand and knocked the gun from the petitioner's hands, launching it upward. The petitioner explained that he reached out to catch the gun before it dropped to the ground, catching it "sandwiched between [his] two hands" with the barrel pointing toward himself. As he attempted to flip the gun around, he accidentally discharged it.

The petitioner did not consult with any physicians about the break-in incident prior to the confrontation with the victim, but, at the criminal trial, Attorney Daly called Charles A. Opsahl, a psychologist, who testified that he had met with the petitioner approximately forty to forty-five times beginning in October, 1987. Dr. Opsahl opined that the petitioner was suffering from post-traumatic stress disorder as a result of the break-in. He further opined that the petitioner entered a "dissociative state"[4] during his argument with the victim as a result of his post-traumatic stress disorder and ultimately concluded that the dissociative state "had a major impact on his ability to control his behavior. . . . He was out of control because of the dissociative state."

The state presented rebuttal evidence from Anne M. Phillips, a clinical psychologist, and Peter M. Zeman, a psychiatrist. Dr. Phillips concluded, on the basis of her two interviews with the petitioner, that there was no evidence of cognitive impairment, a neuropsychological deficit, a thought disorder, or an impulse disorder. Dr. Zeman concluded, on the basis of his four interviews with the petitioner, that the petitioner did suffer from post-traumatic stress disorder of moderate intensity as a result of the break-in incident and that the petitioner experienced feelings of "depersonalization," a "very much more limited kind of dissociative phenomena" during the confrontation with the victim. Dr. Zeman ultimately concluded, however, that the petitioner did not enter a "full-blow[n] dissociative state" and that there was no evidence of "blocking of thought" or delusions.[5] He further concluded that "[the petitioner's] psychiatric condition did not substantially affect his behavior or his control at that time." The state also presented a number of lay witnesses in rebuttal who testified about two prior incidents during which the petitioner drew guns on other individuals.

Attorney Daly requested jury instructions on the affirmative defenses of not guilty by reason of mental disease or defect and extreme emotional disturbance,[6] as well as lesser included offenses of manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide.[7]

We first set forth the general principles surrounding ineffective assistance of counsel claims and our standard of review. "In *Strickland* v. *Washington*, [supra, 466 U.S. 687], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 430, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011).

"The first component, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland*, the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-

guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Santiago* v. *Commissioner of Correction*, 90 Conn. App. 420, 425, 876 A.2d 1277, cert. denied, 275 Conn. 930, 883 A.2d 1246 (2005), cert. denied sub nom. *Santiago* v. *Lantz*, 547 U.S. 1007, 126 S. Ct. 1472, 164 L. Ed. 2d 254 (2006). "Furthermore, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Internal quotation marks omitted.) *Marshall* v. *Commissioner of Correction*, 184 Conn. App. 709, 726, 196 A.3d 388, cert. denied, 330 Conn. 949, 197 A.3d 389 (2018).

"To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 776, 138 A.3d 908 (2016).

"In a habeas appeal, although this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, 119 Conn. App. 239, 241, 987 A.2d 1037, cert. denied, 295 Conn. 912, 989 A.2d 1074 (2010).

Additionally, we note that the death of trial counsel, which deprives the petitioner of testimony on the reasoning behind strategic decisions, poses a "significant

hurdle" to a habeas corpus petitioner seeking to prove a claim of ineffective assistance of trial counsel. *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 823, 234 A.3d 78, cert. granted, 335 Conn. 931, 236 A.3d 218 (2020); see footnote 2 of this opinion. "The death of the petitioner's trial counsel prior to a habeas corpus trial, however, does not absolve a petitioner of his heavy burden of overcoming the strong presumption that counsel provided effective assistance." Id. With the foregoing principles in mind, we now address the merits of the petitioner's claim.

The thrust of the petitioner's argument on his ineffective assistance of counsel claim is that the affirmative defenses Attorney Daly presented at the criminal trial were inconsistent with the petitioner's testimony and the lesser included offenses on which the court instructed the jury. He asserts that the only objectively reasonable trial strategy would have been for counsel to pursue a claim that the weapon was accidentally discharged and to argue that the petitioner's conduct fit the parameters of manslaughter in the second degree. The petitioner also argued before the habeas court that Attorney Daly, by offering the affirmative defenses, conceded the issue of intent and presented a theory of the case that was inconsistent with the petitioner's testimony that the gun accidentally discharged.

The habeas court rejected the petitioner's argument, finding that the petitioner had "wholly misstate[d] or mischaracterize[d] the defense case presented by Attorney Daly. While Attorney Daly did present evidence of a mental disease or defect the petitioner was suffering from at the time of this incident, he wholly maintained, as a first line of defense, that the gun went off accidentally and argued repeatedly before the jury that [it] consider that fact in context with the state's obligation to prove that the petitioner fired the gun intentionally in order to convict him of murder." After making this finding, the court concluded that it was not objectively unreasonable for counsel to have presented the affirmative defenses and the lesser included offenses, questioning "how it could ever be objectively deficient performance for defense counsel to use available facts, especially the client's own story, to offer the jury information that, if accepted, would result in an acquittal on the most serious charge." Thus, the court resolved the ineffective assistance of counsel claim on the performance prong of *Strickland* and did not reach the issue of prejudice.

The petitioner first argues that it was clearly erroneous for the habeas court to find that an accidental discharge of the gun was Attorney Daly's "first line of defense." In making this assertion, the petitioner provides numerous examples in the record where Attorney Daly advanced the affirmative defenses. Our role, however, is simply to determine whether the court's

finding has *some* support in the record, and, to fulfill this obligation, we look at the entire record and not merely portions of the record. See, e.g., *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 741–42, 937 A.2d 656 (2007); see also *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 690–91, 157 A.3d 1192, cert. denied, 327 Conn. 953, 171 A.3d 453 (2017). The court cited to several examples in Attorney Daly's closing argument during which he stressed that the primary issue in the case was whether the petitioner intended to kill the victim. Our review of the record reveals that, in Attorney Daly's closing argument, after a short explanation of the jury's role and a factual summary of the case, the first issue he discussed (in the form of a question he posed to the jury) was, "[d]id [the petitioner] intentionally kill [the victim] on March 22, 1987?" He later reminded the jury that the first determination it had to make was whether the petitioner intended to kill the victim. Attorney Daly also spent a significant amount of time arguing that the shooting was accidental on the basis of the peculiar location of the wound and trajectory of the bullet, and the fact that only a single gunshot was fired. In making its assessment, the habeas court found that Attorney Daly used the evidence advanced in support of the affirmative defenses as an explanation for why the petitioner carried guns with him and why he would have drawn the gun. There is also support in the record for this finding.[8] In sum, it was not clearly erroneous for the habeas court to find that Attorney Daly's primary defense strategy was to argue that the gun was fired accidentally.

The petitioner next argues that it was objectively unreasonable to present a defense that was inconsistent with the petitioner's testimony. Because we agree that Attorney Daly's primary defense strategy was to show that the petitioner lacked the intent to kill the victim, which comports with the petitioner's explanation of how the gun discharged, the petitioner's primary argument is misplaced. To the extent that the petitioner argues that the affirmative defenses and lesser included offenses were inconsistent with *each other*, it is well established that it is not improper for defense counsel to pursue defenses that are inconsistent with each other. This court has concluded that it is consistent with our case law to present "inconsistent and alternative theories of defense" to the jury. (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 129 Conn. App. 325, 330, 20 A.3d 75, cert. denied, 302 Conn. 947, 31 A.3d 382 (2011); see also *State* v. *Nathan J.*, 294 Conn. 243, 262, 982 A.2d 1067 (2009) (explaining that "it is axiomatic that a defendant may present inconsistent defenses to the jury").

The petitioner further argues that, by presenting the affirmative defenses, "Attorney Daly conceded that the petitioner intended to kill the victim, which conflicted with his request for [a jury instruction on] a lesser

included offense, which the jury would only consider if [it] found that the petitioner did *not* possess the requisite intent to kill." (Emphasis in original.) This suggestion is inconsistent with the fundamental principle of our justice system that a defendant is innocent until proven guilty. See, e.g., *In re Winship*, 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The court made it abundantly clear to the jury that it first had to decide whether the petitioner was guilty of murder and that only then would it reach the affirmative defenses.[9] The jury was further instructed that, if the elements of the crime of murder were not found, it was then to proceed to the lesser included offenses. A defendant does not concede the elements of murder by advancing an affirmative defense of mental disease or defect, or extreme emotional disturbance. The state still had to prove that the petitioner had the required intent to kill in order to convict him of murder.

Last, the petitioner argues that presentation of the affirmative defenses was unreasonable because it added "unnecessary complexities to the case" by allowing the state to call witnesses in rebuttal whose testimony tended to show "that the charged offense was not an isolated incident and that the petitioner engaged in a pattern of displaying his gun when threatened." In reviewing claims of ineffective assistance of counsel, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 679. At the time that Attorney Daly called Dr. Opsahl to lay the groundwork for the affirmative defenses, which was before Attorney Daly had requested the jury instructions, the court had already ruled against admitting evidence of the prior incidents in which the petitioner had displayed his guns. We do not find this strategic decision to be objectively unreasonable on the basis of a mere possibility that it could have led to the admission of the state's rebuttal evidence, particularly given that the court instructed the jury that the rebuttal evidence could *not* be used as evidence of intent.[10]

In reaching our conclusion on this claim, we stress that "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney"; (internal quotation marks omitted) *Ampero* v. *Commissioner of Correction*, supra, 171 Conn. App. 681; and that a petitioner will not be able to demonstrate that trial counsel's decisions were objectively unreasonable unless there was "no . . . tactical justification for the course taken." (Internal quotation marks omitted.) *Marshall* v. *Commissioner of Correction*, supra, 184 Conn. App. 726. We cannot conclude that there was no tactical justification for Attorney Daly's defense strategy. Given that Attorney Daly's primary line of defense was consis-

tent with the petitioner's testimony, it was not objectively unreasonable to provide additional layers of defense, supported by expert testimony, should the jury find the petitioner guilty of murder. We agree with the habeas court's skepticism as to whether "it could ever be objectively deficient performance for defense counsel to use available facts, especially the client's own story, to offer the jury information that, if accepted, would result in an acquittal on the most serious charge." The habeas court correctly concluded that the petitioner failed to establish that Attorney Daly's performance was deficient and, thus, correctly denied his ineffective assistance of counsel claim as to Attorney Daly.

II

The petitioner next claims that the habeas court erred in concluding that his conflict of interest claim as to Attorney Daly was both procedurally defaulted and waived. The petitioner also claims that the conflict of interest resulted in a complete structural breakdown of the adversarial system, thus warranting the presumption of prejudice under *Cronic*. The respondent, the Commissioner of Correction, argues that the habeas court properly determined that the petitioner's conflict of interest claim was both procedurally defaulted and waived. We agree with the respondent.[11]

The following additional facts are relevant to our resolution of this claim. In September, 1987, roughly one year before the petitioner's criminal trial, the petitioner's father contacted Attorney Wice, a high school friend who had a law practice based in Texas, and asked him to assist in the petitioner's representation. After receiving permission from Attorney Daly to assist him with the case, Attorney Wice flew to Connecticut to meet with the petitioner and his family. Attorney Daly agreed that Attorney Wice would act as second chair and assist with research, strategy, crafting a defensive theory, and anything else that would be helpful. During the next several months, Attorney Wice reviewed various discovery materials and frequently met with Attorney Daly to craft trial strategy. On January 20, 1988, Attorney Wice filed a motion for permission to appear as counsel pro hac vice so that he could join Attorney Daly in representing the petitioner at his criminal trial. The court denied the motion.[12] After the denial of the motion, Attorney Wice largely stopped assisting with trial preparation but still attended court every day with the petitioner.

Five days before the start of trial, the state filed a notice of intent to introduce evidence of prior bad acts, specifically testimony concerning two prior events during which the petitioner threatened strangers with a firearm. The state sought to introduce this testimony in its case-in-chief, but the court denied the request. After the defense rested, the state sought to introduce

rebuttal testimony from six witnesses who would discuss these incidents and the petitioner's relationship with guns. The court maintained its prior ruling that the evidence would be inadmissible as proof of the petitioner's intent but allowed the state to present the testimony in an offer of proof to determine the admissibility of the evidence for the purpose of discrediting Dr. Opsahl. At that point, Attorney Daly requested a recess and a discussion with the prosecutor off the record, indicating that the presentation of the rebuttal witnesses "presents a rather grave problem for me." After the recess, Attorney Daly explained that two of the state's proposed witnesses, Robert Udolf and John Rubino, "are clients of mine and my office, and have been for some substantial period of time." Udolf and Rubino had been identified as potential state's witnesses during jury selection, but Attorney Daly did not raise the potential conflict at that time. He proposed that Attorney Wice be admitted pro hac vice for the limited purpose of cross-examining the state's rebuttal witnesses. The following exchange then occurred between the court and the petitioner:

"The Court: And [petitioner], would you come forward. You were in court when the names came up from [Attorney Daly] concerning the offer of certain evidence in connection with your conduct in front of certain offered witnesses. At that point, [Attorney Daly] indicated that he had represented two of these witnesses previously and that they were clients of his, which raises at least an apparent conflict. And that he wanted a recess in order to talk with you concerning his representation and his ability to be in a position to adequately and fairly cross-examine these witnesses. He had discussed this with you?

"[The Petitioner]: Yes, sir.

"The Court: And he's named the two witnesses to you that are—or previously had been clients of his?

"[The Petitioner]: Yes, Your Honor.

"The Court: And that, by virtue of that, that he does have a present conflict in cross-examining adequately and fairly those two witnesses.

"[The Petitioner]: Yes, sir.

"The Court: And he suggested, for that purpose, that another attorney be engaged by you to do that cross-examination.

"[The Petitioner]: Yes, Your Honor.

"The Court: And you're satisfied that he does have that conflict?

"[The Petitioner]: Yes, sir.

"The Court: And for that purpose you have asked [Attorney] Wice to stand in for at least those two witnesses?

"[The Petitioner]: Yes, sir.

"The Court: And [Attorney Daly] indicated that, rather than having some question about their testimony or the aggregate testimony, that [Attorney] Wice do the whole cross-examination of all of the witnesses concerning these two events.

"[The Petitioner]: Yes, Your Honor.

"The Court: And are you satisfied with that arrangement?

"[The Petitioner]: Yes, Your Honor."

The court then partially reversed its prior ruling on the motion for admission pro hac vice, allowing Attorney Wice to be admitted for this limited purpose, noting, "I don't see the availability of another counsel who would be more equipped to do it because [Attorney] Wice has sat through the whole trial and knows all the evidence that's been presented. So that he's certainly in a—from a standpoint of knowledge—in a better position than any other counsel starting off."

With this arrangement in place, the state proceeded with its offer of proof outside the presence of the jury. Witnesses Thomas Cronin and Mark Higby described an incident in October, 1986, during which Cronin had a confrontation with the petitioner at the Prospect Café. While at the bar, Cronin's brother-in-law made a comment about a Jewish friend, which the petitioner overheard. Thirty minutes later, the petitioner approached Cronin and his brother-in-law, and said, "[d]on't you ever fucking say something about Jewish people again because, if you do, next time I come in here I'm going to be looking for you." The petitioner then lifted his shirt, revealing a gun tucked into his waistband. Attorney Daly explained to the court that he would handle cross-examination of the witnesses who testified about the October, 1986 first incident because his two clients, Udolf and Rubino, would testify about only the second incident. Nevertheless, Attorney Daly did not cross-examine either witness.

Witnesses Udolf, Rubino, Higby,[13] and Kevin McCurry then testified concerning an incident that occurred at the Pacifico Bar and Restaurant (Pacifico) in West Hartford on January 23, 1987. Udolf testified that he went to Pacifico to meet two women for drinks and that they had to ask the petitioner to stop "bothering" them. The petitioner followed the group outside and "start[ed] a major argument about something." Udolf testified that he began to feel scared and started to grab chemical Mace from his pocket, at which point the petitioner drew his gun, pointed it at Udolf, and said, "that's nothing, tough guy . . . ." Rubino testified that he went to Pacifico on January 23, 1987, and, as he was waiting for the valet to bring him his car, he saw the petitioner draw his gun on Udolf. McCurry testified that he was

employed as the valet at Pacifico on the same night and also witnessed the confrontation. Higby testified that the petitioner later told him about the incident. Attorney Wice did not cross-examine any of the witnesses, although both he and Attorney Daly objected to the testimony being presented to the jury.

After the offer of proof, the court allowed the proffered evidence to be submitted to the jury for a limited purpose.[14] The witnesses were then recalled in the presence of the jury and walked through their testimony a second time. In addition, Julie Dolinger, a former roommate of the petitioner who did not testify during the offer of proof, also testified that the petitioner had showed her his guns and how to load them, and told her about the Pacifico incident. During the offer of proof, Attorney Daly had dealt with the two witnesses who testified about the Prospect Café incident, and Attorney Wice had dealt with the four witnesses who testified about the Pacifico incident. When their testimony was presented to the jury, however, Attorney Daly handled the testimony of the Prospect Café witnesses, Higby and Cronin, as well as the Pacifico incident witnesses, Higby, McCurry, and Dolinger, who were *not* his clients. He briefly cross-examined Higby and Dolinger but did not cross-examine Cronin or McCurry. Attorney Wice handled the testimony of the two Pacifico witnesses who were Attorney Daly's clients, Udolf and Rubino, but did not cross-examine either of them.

The petitioner claimed that Attorney Daly's concurrent representation of Udolf and Rubino resulted in an actual conflict of interest and that having Attorney Wice handle their cross-examination was insufficient to ameliorate the possibility that Attorney Daly's conflict would prejudice the petitioner. The respondent asserted in his return that the petitioner had procedurally defaulted on his conflict of interest claim by failing to raise it at trial or on direct appeal. The respondent claimed, as well, that the petitioner had waived the claim. The court agreed with the respondent, concluding that this conflict of interest claim was both procedurally defaulted and waived.

Before we address the petitioner's claims, we briefly set forth the law concerning conflicts of interest in criminal representation. "It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our [s]ixth [a]mendment cases hold that there is a correlative right to representation that is free from conflicts of interest." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

"In a case of a claimed conflict of interest . . . in order to establish a violation of the sixth amendment the

defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an *actual conflict of interest* adversely affected his lawyer's performance. . . . Where there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . Accordingly, an ineffectiveness claim predicated on an actual conflict of interest is unlike other ineffectiveness claims in that the petitioner need not establish actual prejudice." (Emphasis in original; internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 813, 194 A.3d 316, cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018).

A

The petitioner first argues that the habeas court improperly determined that his conflict of interest claim regarding Attorney Daly was procedurally defaulted because he did not raise the claim at trial or on direct appeal. We agree with the habeas court that this conflict of interest claim could have been raised on direct appeal and, thus, the habeas court properly ruled that the claim was procedurally defaulted.

A habeas court's conclusion that a petitioner's claim was in procedural default involves a question of law, over which our review is plenary. See, e.g., *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 566, 941 A.2d 248 (2008).

We begin with a review of the procedural default rule. "Under the procedural default doctrine, a [petitioner] may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding, unless he can prove that his default by failure to do so should be excused." (Internal quotation marks omitted.) *Cator* v. *Commissioner of Correction*, 181 Conn. App. 167, 199, 185 A.3d 601, cert. denied, 329 Conn. 902, 184 A.3d 1214 (2018). Ordinarily, if the respondent "alleges that a [petitioner] should be procedurally defaulted from now making the claim, the [petitioner] bears the burden of demonstrating good cause for having failed to raise the claim directly, and he must show that he suffered actual prejudice as a result of this excusable failure." *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 852, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016). This cause and prejudice test derives from *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), and has been held by our Supreme Court to be "the appropriate standard for reviewability in a habeas corpus proceeding of constitutional claims not adequately preserved at trial because of a procedural default . . . ." *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 409, 589 A.2d 1214 (1991); see also

*Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132, 629 A.2d 413 (1993) (holding that "the *Wainwright* cause and prejudice standard should be employed to determine the reviewability of habeas claims that were not properly pursued on direct appeal").

The habeas court explained that the record was sufficient for the petitioner to raise his conflict claim on direct appeal: "The petitioner . . . [argues] that this matter required additional evidence to be developed during an evidentiary hearing, which could not have been accomplished on appeal. The petitioner's focus is misplaced. There is no question that an evidentiary hearing could not have been held during the appeal. However, there was an inquiry and a canvass regarding this conflict of interest on the record. The question of whether the canvass was legally sufficient, which the petitioner attempts to turn into the 'need' for an evidentiary hearing, is exactly what could have been challenged before the trial court or addressed by the Appellate Court, if the issue had been properly raised. . . . The petitioner again attempts to turn his failure to offer any prior challenge to a court ruling into a need for additional factual findings for the first time by way of collateral attack. If the trial court record was allegedly inadequate for review, then the petitioner must bear that burden because he has not offered any proof that something external to the defense prohibited a challenge from being made, an additional canvass requested, or from an appeal from being filed." (Citation omitted.)

The petitioner argues again on appeal that the claim could not be procedurally defaulted because the record was inadequate to raise the claim on direct appeal. Specifically, he contends that the testimony of Attorney Wice at the habeas hearing that he had not been prepared at the criminal trial for the cross-examination was necessary to establish the claim. Although our Supreme Court has stated that, "[a]lmost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim"; (internal quotation marks omitted) *State* v. *Crespo*, 246 Conn. 665, 687–88, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); this rationale does not apply to claims when the evidentiary record was adequate for review on direct appeal. See *McCarthy* v. *Commissioner of Correction*, 192 Conn. App. 797, 811–13, 218 A.3d 638 (2019) (freestanding due process claim based on fabrication of evidence procedurally defaulted because petitioner was aware of alleged fabrication during criminal trial and at time of direct appeal).

In *Crespo*, our Supreme Court analyzed whether a defendant could seek review, in a direct criminal appeal, of a conflict of interest claim not raised at trial under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823

(1989), and concluded that the record was inadequate for a reviewing court to determine whether counsel's actions were the result of a legitimate trial strategy or a possible conflict: "We cannot know for certain from the record, however, whether [counsel's actions constituted a legitimate trial strategy], nor can we determine from the record whether [counsel] adequately explained to the defendant any possible conflict, if one existed, and obtained the defendant's consent to his continued representation. We may speculate regarding the divergence of [counsel's] and the defendant's interests, but there are no facts from which we may conclude, as a matter of law, that a conflict actually existed. We have recognized that the trial transcript seldom discloses all of the considerations of strategy that may have induced counsel to follow a particular course of action. . . . It is because of this typical lack of an adequate record that we ordinarily require a defendant to raise conflict of interest claims in a habeas corpus proceeding. . . . Although we cannot conclude with any degree of certainty from the record that the offer of the stipulation was an actual conflict of interest, we are equally unable to determine that it was not. Resolution of this issue, therefore, must await the development of an adequate factual record in an appropriate, posttrial proceeding." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 693–94. Similarly, in *State* v. *Navarro*, 172 Conn. App. 472, 489–92, 160 A.3d 1116, cert. denied, 326 Conn. 910, 164 A.3d 681 (2017), this court declined to review a conflict of interest claim on direct appeal. We explained that, when a defendant identifies only "several *potential* conflicts," the record is inadequate to determine whether counsel labored under a conflict of interest, as a successful conflict of interest claim requires a showing of an *actual* conflict of interest. (Emphasis in original.) Id., 491.

The concerns highlighted in *Crespo* and *Navarro* are not present in this case, the record of which contains sufficient information for the conflict of interest claim to have been reviewed on direct appeal. The record reveals the exact nature of Attorney Daly's conflict of interest, and the canvass reveals that the court explained to the petitioner that Attorney Daly would have a "present conflict" if he were to cross-examine Udolf and Rubino. In *Collins* v. *Commissioner of Correction*, 202 Conn. App. 789, 796, 799–800, 246 A.3d 1047, cert. denied, 336 Conn. 931, 248 A.3d 1 (2021), this court held that a habeas court improperly found that a conflict of interest claim was defaulted where "[counsel] never raised the potential for a conflict of interest with the court, nor did the court raise the issue on its own. As such, it was not until the habeas trial itself that [counsel] explained on the record specifically *why*" he proceeded with the course of action that was claimed to have been tainted by the conflict of interest.

(Emphasis in original.) Id., 798. In the present case, the record clearly establishes that Attorney Daly brought the conflict to the court's attention and explained the nature of the conflict. The court then discussed the conflict with the petitioner and acquired his assent to proceed with Attorney Wice handling the cross-examination of Udolf and Rubino. The record also reveals the immediate consequences of the apparent conflict, that Attorney Wice handled the cross-examination of Udolf and Rubino but ultimately asked no questions.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule. . . . [For example] a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials . . . would constitute cause under this standard." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 568. The habeas court properly observed that the factual and legal basis for this claim was apparent on the record and, thus, available to counsel at the time of appeal. Accordingly, the petitioner cannot establish good cause for not raising the issue on direct appeal. The court appropriately concluded that the claim was procedurally defaulted.

B

The petitioner also claims that the habeas court improperly found that he had waived his conflict of interest claim regarding Attorney Daly. The respondent argues that the court properly found that the petitioner's waiver was knowing and intelligent. We agree with the respondent.

"Where there is an actual or potential conflict . . . the court must obtain a valid waiver from the defendant if counsel is to continue to represent the defendant. A valid waiver of a constitutional right . . . must be knowing and intelligent, accomplished with sufficient awareness of the relevant circumstances and likely consequences. . . . [T]he fact that a defendant, with full awareness of the circumstances and consequences of the potential conflict, waives his right to the effective assistance of counsel must appear on the record in clear, unequivocal, unambiguous language." (Internal quotation marks omitted.) *DaSilva* v. *Commissioner of Correction*, 132 Conn. App. 780, 790, 34 A.3d 429 (2012). "If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally . . . that he nevertheless chooses to hazard [the] dangers of waiving conflict-free representation, then his waiver may appropriately be accepted. . . . The waiver is not vitiated simply because the

defendant, with the benefit of hindsight, might have chosen differently. A defendant need not be prescient in order to waive knowingly and intelligently the right to conflict-free representation." (Citations omitted; internal quotation marks omitted.) *State* v. *Tilus*, 157 Conn. App. 453, 467, 117 A.3d 920 (2015), appeal dismissed, 323 Conn. 784, 151 A.3d 382 (2016).

In concluding that the petitioner had waived his conflict of interest claim, the habeas court stated: "The record in the present case reveals that, after being notified of the conflict and being provided with the opportunity to discuss the matter with Attorney Daly, the petitioner indicated to the court that he had discussed the nature of the conflict with counsel, that he understood it and the limitations that it placed on Attorney Daly, that he understood the proposed resolution of having Attorney Wice cross-examine the problematic witnesses, and that he was willing to proceed with the case. The waiver was adequate on its face, and the petitioner has failed to provide any evidence to support the allegation that he did not fully understand it or . . . was otherwise unsure of his decision." We agree with the court. The record indicates that the petitioner and Attorney Daly discussed the conflict during the recess, the court explained that Attorney Daly could not "adequately and fairly" cross-examine Udolf and Rubino as a result of the conflict, and that the petitioner approved of having Attorney Wice cross-examine the two witnesses.

The petitioner argues that his waiver was premised on cross-examination actually occurring, but neither the trial record nor the habeas record reveals that the petitioner was ever told cross-examination would occur or that he instructed Attorney Wice to cross-examine Udolf and Rubino. To the contrary, as the respondent points out, the record indicates that the petitioner was told that the plan was not to ask the witnesses any questions. Indeed, with the exception of the petitioner's roommates, who heard about the incident at Pacifico from the petitioner, *none* of the rebuttal witnesses who testified about the incidents at the Prospect Café and Pacifico was asked questions on cross-examination. Furthermore, that the petitioner waived his conflict of interest claim and approved of having Attorney Wice handle the cross-examination of Udolf and Rubino does not foreclose him from claiming that Attorney Wice's handling of those examinations was ineffective. We address that claim in part III of this opinion.

In sum, the court properly concluded that the conflict of interest claim was waived.

C

The petitioner also made a claim in a separate count of his habeas petition that Attorney Daly's conflict of interest "prevented him from subjecting the state's wit-

nesses to any meaningful cross-examination," and, thus, prejudice should have been presumed under *United States* v. *Cronic*, supra, 466 U.S. 648. The habeas court also determined that the petitioner's *Cronic* claim was procedurally defaulted, which the petitioner now disputes.

The doctrine of procedural default is applicable to *Cronic* claims that could have been raised on direct appeal. See generally *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 153 A.3d 1264 (2017). Accordingly, for the same reasons discussed previously, we conclude that the habeas court correctly determined that the petitioner's *Cronic* claim was procedurally defaulted, as it has a factual basis that is identical to his conflict of interest claim.

### III

The petitioner next claims that the habeas court improperly denied his claim of ineffective assistance as to Attorney Wice's failure to cross-examine Udolf or Rubino. The petitioner argues that Attorney Wice failed to subject the state's case to meaningful adversarial testing, and, therefore, prejudice is presumed under *Cronic*. The respondent argues that the court correctly determined that the petitioner was not entitled to a presumption of prejudice under *Cronic*. We agree with the respondent.

We reiterate the legal principles set forth in part I of this opinion, particularly that a claim of ineffective assistance of counsel requires a showing that counsel's performance was both deficient and resulted in prejudice to the petitioner. See *Vazquez* v. *Commissioner of Correction*, supra, 128 Conn. App. 430. "*Strickland* recognized, however, that [i]n certain [s]ixth [a]mendment contexts, prejudice is presumed. . . . In . . . *Cronic* . . . which was decided on the same day as *Strickland*, the United States Supreme Court elaborated on the following three scenarios in which prejudice may be presumed: (1) when counsel is denied to a [petitioner] at a critical stage of the proceeding; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when counsel is called upon to render assistance in a situation in which no competent attorney could do so." (Citation omitted; internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 554–55, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*, U.S. , 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016). "This is an irrebuttable presumption. See *State* v. *Frye*, 224 Conn. 253, 262, 617 A.2d 1382 (1992) (right to counsel is so basic that its violation mandates reversal even if no particular prejudice is shown and even if there is overwhelming evidence of guilt) . . . ." (Internal quotation marks omitted.) *Newland* v. *Commissioner of Correction*, 322 Conn. 664, 699–700, 142 A.3d 1095 (2016) (*McDonald, J.*, dissenting). "[C]ourts

have rarely applied *Cronic*, emphasizing that only [non-representation], not poor representation, triggers a presumption of prejudice." (Internal quotation marks omitted.) *Hutton* v. *Commissioner of Correction*, 102 Conn. App. 845, 856, 928 A.2d 549, cert. denied, 284 Conn. 917, 931 A.2d 936 (2007). "The United States Supreme Court has emphasized . . . how seldom circumstances arise that justify a court in presuming prejudice, and concomitantly, in forgoing particularized inquiry into whether a denial of counsel undermined the reliability of a judgment . . . ." (Internal quotation marks omitted.) *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 531, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019). Our Supreme Court has further explained that "specific errors in representation, for which counsel can provide some reasonable explanation, are properly analyzed under *Strickland*. . . . Counsel's complete failure to advocate for a defendant, however, such that no explanation could possibly justify such conduct, warrants the application of *Cronic*." (Citation omitted.) *Davis* v. *Commissioner of Correction*, supra, 556.

The habeas court concluded that the petitioner was not entitled to a presumption of prejudice under *Cronic*, explaining that, "[u]nlike the *Cronic* line of cases, the issue here does not deal with any witnesses in the state's case-in-chief; it only involves two of four witnesses who testified to the same incident, and the evidence was admitted only for a limited purpose of the credibility [and] the overall accuracy of one of the defense experts' opinion on the petitioner's mental health, and as to the credibility of inferences and testimony the petitioner gave about his familiarity with handling guns. Given the narrow issue involved, the fact that only two out of the dozens of witnesses who testified in the case were concerned, and the fact that the same or substantially similar testimony from two other witnesses remains unchallenged, this is not the type of issue that undermines the confidence in the fabric of the entire trial." (Footnote omitted.)

We agree with the court that Attorney Wice's actions do not rise to a level that our jurisprudence dictates would constitute a failure to subject the state's case to meaningful adversarial testing and thus require a presumption of prejudice. The second *Cronic* exception is exceedingly narrow. See *Leon* v. *Commissioner of Correction*, supra, 189 Conn. App. 533; *Hutton* v. *Commissioner of Correction*, supra, 102 Conn. App. 856. "[T]he United States Supreme Court made clear . . . that the second exception in *Cronic* applies only when the attorney's failure is complete, rather than simply an alleged failure at specific points in the trial . . . ." *Taylor* v. *Commissioner of Correction*, supra, 324 Conn. 647 n.5. Even if we presume that it was error not to cross-examine Udolf and Rubino, it cannot be said that Attorney Wice's failure was "complete." As an example of an "utter lack of advocacy," in *Edwards* v. *Commis-*

*sioner of Correction*, 183 Conn. App. 838, 851, 194 A.3d 329 (2018), this court found that counsel's actions had resulted in a failure to subject the state's case to any meaningful adversarial testing. This court summarized, stating that, "[a]lthough [counsel] claimed to have formed a 'theory of the case'—that the petitioner did not attack the victim—he did nothing at the petitioner's criminal trial to advance that theory. The petitioner consistently has claimed that he did not assault the victim. Despite the petitioner's adamance, [counsel] declined to cross-examine *any* of the three people who were present at the time of the assault. As noted previously, [counsel] failed to meaningfully cross-examine *any* of the state's witnesses except for a police officer, whom he asked irrelevant questions." (Emphasis added.) Id., 850.

Here, the petitioner challenges only Attorney Wice's failure to cross-examine two of the state's six rebuttal witnesses. Our review of the record confirms that the remainder of the state's case was subjected to meaningful adversarial testing. During the examination of the lead police detective, Attorney Daly conducted multiple voir dire examinations and objected frequently but did not conduct a cross-examination. He then, again, conducted multiple voir dire examinations during examination of the second police detective and conducted a cross-examination. He cross-examined the first law enforcement officers who responded to the crime scene, the state's medical and firearms experts, and the majority of the state's lay witnesses, including patrons and employees of the Prospect Café. Furthermore, Attorney Daly called four defense witnesses, including members of the petitioner's family and Dr. Opsahl. Thus, the state's case was subjected to meaningful adversarial testing.

Accordingly, Attorney Wice's alleged failures are more appropriately analyzed under the performance and prejudice test outlined in *Strickland*. Because, however, the petitioner does not challenge on appeal the habeas court's determination that he failed to establish prejudice under *Strickland*, no additional analysis is necessary.[15] In fact, the petitioner explicitly stated in his brief to this court that "[h]is claim should not be analyzed for prejudice under *Strickland*." We agree with the habeas court that *Cronic* does not apply to the petitioner's claim; thus, the petitioner was required to prove prejudice, and the habeas court's finding of no prejudice stands unchallenged. The habeas court correctly denied the petitioner's ineffective assistance of counsel claim.

IV

Last, the petitioner contends that the habeas court improperly declined to apply a cumulative prejudice approach to his claims and to consider the aggregate effect of counsel's alleged errors. The respondent argues that Connecticut state courts have declined to

adopt a cumulative error approach and that, regardless, because the petitioner failed to demonstrate that counsel acted deficiently, there are no errors to accumulate. We agree with the respondent.

"Our appellate courts . . . have consistently declined to adopt this [cumulative error analysis]. When faced with the assertion that the claims of error, none of which individually constituted error, should be aggregated to form a separate basis for a claim of a constitutional violation of a right to a fair trial, our Supreme Court has repeatedly decline[d] to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts. . . . Because it is not within the province of this court to reevaluate decisions of our Supreme Court . . . we lack authority under the current state of our case law to analyze the petitioner's ineffective assistance claims under the cumulative error rule." (Citations omitted; internal quotation marks omitted.) *Cooke* v. *Commissioner of Correction*, 194 Conn. App. 807, 819, 222 A.3d 1000 (2019), cert. denied, 335 Conn. 911, 228 A.3d 1041 (2020). We cannot grant the relief the petitioner seeks.

Moreover, the habeas court concluded that, because "the petitioner has failed to prove each of the individual claim[s] upon which this final 'catchall' claim rests, it is not necessary to engage in any additional detailed discussion. [Because] all other claims have failed on their individual merits, this claim, too, fails." Thus, even if aggregate error analysis were viable here, it is not necessary to consider the aggregate effect of the alleged errors because we agree with the habeas court's disposition of the petitioner's individual claims.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The petitioner concedes that the state "presented undisputed evidence that the petitioner fatally shot the victim at [the] Prospect Café in [West] Hartford on March 22, 1987."

[2] The parties stipulated that Attorney Daly died on April 4, 2002. His file from the criminal trial could not be located.

[3] The petitioner also asserts in the introductory portion of his ineffective assistance of counsel argument in his brief that his rights under article first, §§ 8 and 9, of the constitution of Connecticut were violated. However, beyond that cursory assertion, the petitioner's brief does not contain any substantive analysis of potential Connecticut constitutional violations. Accordingly, we decline to review these claims. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)); see also *Whistnant* v. *Commissioner of Correction*, 199 Conn. App. 406, 420 n.13, 236 A.3d 276, cert. denied, 335 Conn. 969, 240 A.3d 286 (2020).

[4] Dr. Opsahl defined dissociative state as "a technical term used to describe when a person essentially loses control of the person they are and becomes someone else or goes somewhere else in mental terms."

[5] Dr. Zeman defined "blocking of thought, thought disorder, and delusional thinking [as] all terms which describe a psychotic state of mind in which somebody who's extremely out of touch with reality on the basis, for example, of a psychotic illness such as schizophrenia, will have a jumbling of his or her thinking, thoughts will be confused, jumbled, out of order or

there may be long periods of what are called blocking of thought where there's lapses of thought as if somebody's thoughts have just shut off and then start up again. I saw—I saw no evidence of that in my evaluation of [the petitioner]."

[6] The affirmative defense of mental disease or defect is a defense in "any prosecution for an offense" and provides that "it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a).

Extreme emotional disturbance is an affirmative defense to murder, which is set forth in the applicable statute defining murder: "Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person." General Statutes § 53a-54a (b).

[7] "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." General Statutes § 53a-55 (a).

"A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person; or (2) he intentionally causes or aids another person, other than by force, duress or deception, to commit suicide." General Statutes § 53a-56 (a).

"A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle." General Statutes § 53a-58 (a).

[8] During closing argument, Attorney Daly stated: "There's nobody in that jury box in this courtroom any unhappier than I am about the prospect of people such as [the petitioner] walking around with that weapon in their belt. I'm not justifying his having done it; I'm explaining to you why he did it . . . I'm trying to tell you he did it for some reason other than downright meanness. He did it . . . [because] it was the only way, the only—his only link with security. It's the only way he could feel secure." Attorney Daly further stated: "I respectfully suggest to you that the only person who would get all upset about it, who would eventually draw his gun, is somebody who was suffering from a mental disease or a defect of such a character as to destroy the control mechanisms in his mind. And when those mechanisms got interfered with, he took the loaded gun [out] of his pocket and it went off."

[9] The trial court instructed the jury: "If you find that the state has failed to prove to you beyond a reasonable doubt any one of these elements, then you must find the [petitioner] not guilty of murder. If you find that the state has convinced you of each of these elements beyond a reasonable doubt, you must then consider the two affirmative defenses the [petitioner] has raised in this case. . . . The burden that the [petitioner] has as to the affirmative defense . . . does not diminish in any way the burden that the state has of proving his intent, whether it be the general intent or specific intent."

[10] The court instructed the jury as follows: "Now, you'll probably note that the state did not offer this in its direct case. And there is a reason for that. The law prohibits the state from offering past misconduct to show a propensity for doing misconduct. . . . Even with the admission of this evidence, you are not permitted to use that evidence in that way. The evidence is being admitted for two purposes. The first is that, what was admitted in the defense case was certain history of the [petitioner], particularly the event of February, 1986, in which he was—his bedroom door was alleged to have been kicked in and that he was threatened by an individual . . . . And [Dr. Opsahl] had given an opinion on the basis of that history that his purchase of guns and his use [of them] as in this particular case

resulted in a loss of control or behavior. And from the standpoint that that event [in] February continued to come back and he was reenacting that event. So, it's allowed for the state, then, once that's offered, to show evidence whether or not there has been, on prior occasions, loss of control or behavior. So, this evidence . . . is to be used by you to determine whether or not . . . Dr. Opsahl's opinion or diagnosis was based on factual matters. And, secondly, whether or not the [petitioner] has been truthful to the doctor in relating events and truthful with you in relating events."

[11] The petitioner asserts in the introductory portion of his conflict of interest argument in his brief that his rights under article first, §§ 8 and 9, of the constitution of Connecticut were violated. For the same reasons set forth in footnote 3 of this opinion, we decline to review these claims.

[12] The petitioner challenged the denial of the pro hac vice motion in count one of the operative habeas petition. The habeas court concluded that the claim was procedurally defaulted. The petitioner has not challenged this ruling on appeal.

[13] Higby was the petitioner's roommate at the time of these events. He was present at the Prospect Café during the confrontation in October, 1986, but heard from the petitioner about the second incident at issue, which occurred at the Pacifico Bar and Restaurant in West Hartford on January 23, 1987.

[14] See footnote 10 of this opinion.

[15] After resolving the *Cronic* claim, the habeas court resolved the petitioner's *Strickland* claim by concluding that the petitioner had failed to establish prejudice, concluding: "[T]he petitioner would need to show some actual harm . . . . Here, the petitioner failed to present Rubino or Udolf as witnesses to prove the allegedly helpful information that could have, or should have, been elicited form them via cross-examination, which, alone is sufficient to defeat his claim. . . . An additional basis is that [McCurry] and [Higby] were two additional witnesses who testified about the same incident . . . during the offer of proof and before the jury. Neither of them was subjected to any cross-examination during either proceeding, and the petitioner offers no challenges at all to the testimony or handling of either witness. Therefore, even if some challenge to the credibility of Udolf or Rubino had been offered, the testimony of these other two witnesses would have gone to the jury unchallenged. Therefore, the petitioner's claim fails because he has failed to show any harm . . . ." (Citations omitted.)